**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **David L. Lisy,** | ) | **CASE NO. 1:20 CV 1416** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Cuyahoga County, Ohio, *et al*,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>INTRODUCTION</u>

This matter is before the Court upon defendant Cuyahoga County's Motion for Summary Judgment (Doc. 16).  This is a §1981 action arising out of plaintiff's employment with defendant.  For the reasons that follow, defendant's Motion for Summary Judgment is GRANTED.

### <u>FACTS</u>

Plaintiff David L. Lisy brought this action against Cuyahoga County and the Cuyahoga

County Sheriff's Department.[1]  The Complaint contains three claims for relief.  Count One is a claim for discrimination and retaliation in violation of 42 U.S.C. § 1981.  Count Two is a claim for retaliation and a hostile work environment in violation of O.R.C. § 4112.02(I).  Count Three is a claim for discrimination and a hostile work environment in violation of O.R.C. § 4112.02(A).

Written documentary evidence submitted to the Court establishes the following.[2]

Plaintiff is of African-American, Native American, and Caucasian descent.  He joined the Cuyahoga County Sheriff's Department ("the Department") in 2006 as a deputy sheriff.  He was promoted to the rank of sergeant in 2013.  In 2014, he was assigned to the Detective Bureau.  In 2015, plaintiff was assigned to the Use of Deadly Force ("UDF") team.  This was not a full-time position.  He served on the Detective Bureau and the UDF team simultaneously.

*2014 EEOC Charge*

In 2011, plaintiff started working on an High Visibility Enforcement Overtime

---

[1]  The parties agree that sheriff departments "are not *sui juris* and, therefore, cannot sue or be sued."  *Deir v. Lake County*, 2012 WL 1142467, *3 (N.D. Ohio April 4, 2012) (internal citations omitted).  Accordingly, the Cuyahoga County Sheriff's Department is DISMISSED from this action.

[2]  Plaintiff repeatedly cites to the Complaint in setting forth his version of the facts.  The Court acknowledges that a verified complaint "carries the same weight as would an affidavit for the purposes of summary judgment."  *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).  However, while plaintiff "avers" these facts occurred, he did not sign the Complaint under penalty of perjury. It is therefore not a verified complaint.  Plaintiff cannot merely rely on unsupported allegations contained in the Complaint in order to defeat a motion summary judgment, but must present affirmative evidence to support his claim.  *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003).  Accordingly, the Court did not include any of plaintiff's unsupported allegations in setting forth the relevant facts.

("HVEO") detail. The hours he worked on this detail were typically overtime. Sergeant Campbell ("Campbell") was the sergeant who assigned the hours. In 2014, plaintiff was removed from the HVEO detail. Plaintiff spoke to his supervisor at the time, Lieutenant Bryan Smith ("Smith"), regarding his removal. Smith explained to plaintiff that he was removed from the detail because Campbell had complained about plaintiff not correctly formatting his HVEO reports. However, according to plaintiff, he was being "singled out" because other officers assigned to this detail did not format their reports in the same manner. Plaintiff suspected that his race was a factor for his removal from the detail.

According to Smith's deposition testimony, Smith had multiple conversations with plaintiff about his report formatting. According to Smith, everyone in the HVEO unit formatted their reports correctly except for plaintiff. Plaintiff "was the only one not doing it" in the proper format. Plaintiff's actual work on the detail was "outstanding."

On May 28, 2014, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). He alleged that the Department had discriminated against him on the basis of his race when it had removed him from the HVEO detail.

Plaintiff approached then-Chief Clifford Pinkney ("Pinkney") around the time he filed the charge. According to plaintiff, he sought out Pinkney's advice because he knew that Pinkney had previously filed an EEOC charge. He recalls Pinkney advising him to request a review if the charge was denied. According to Pinkney, he told plaintiff that he would support him whether or not he decided to file an EEOC charge. He did not attempt to dissuade plaintiff from filing the charge.

According to plaintiff, after he filed his EEOC charge, Pinkney called him into his office.

3

Pinkney threw the EEOC papers across a table and told plaintiff that the charge was going to be denied.  Plaintiff testified that Pinkney told him that "You can claim whatever you want to, but you were promoted to sergeant."  Pinkney denies that this conversation ever occurred.

Plaintiff was later re-instated to the HVEO detail in either late 2015 or early 2016.  He did not file a lawsuit after receiving a "right to sue" letter from the EEOC in connection with his May 2014 charge.

Plaintiff also served on the Marine Patrol detail.  This detail was also an overtime opportunity.  Plaintiff was appointed to this detail following his removal from the HVEO team.

*2016 Internal Complaint/2016 EEOC Charge*

On January 14, 2016, plaintiff emailed Cuyahoga County Executive Armond Budish ("Budish") regarding now-Sheriff Pinkney.  Within the email, he asserted that Pinkney had retaliated against him for his 2014 EEOC charge.  Specifically, he alleged that Pinkney had made offensive comments, only promoted his friends, had an offensive, racist, iPhone password, and had allowed the Deputy's Union to "bash" plaintiff over his expunged criminal record.  Plaintiff indicated that he had more information and inquired if Budish would be interested in speaking with him.

On January 19, 2016, plaintiff filed a complaint with the Cuyahoga County Human Resources Department ("HR") alleging racial discrimination, harassment, and retaliation.[3]  On January 25, 2016, plaintiff emailed Lori Acosta ("Acosta"), an HR representative, with a list of

---

[3]  Plaintiff testified that he also sent confidential memoranda to Budish, the HR director, and former Cuyahoga County Sheriff Frank Bova on November 10, 2015 and January 19, 2016, detailing his allegations in chronological order.  Both the parties and the Court note that these memoranda reference dates that occurred after the date these memoranda were purportedly sent.

4

potential witnesses to his allegations.

According to Smith, on January 19, 2016, he was called down to Pinkney's office. Pinkney questioned him regarding the expense of the rental vehicles for a recent UDF trip. Pinkney also told Smith that Budish had admonished him over the weekend regarding a complaint Budish had received.  Pinkney did not reveal to Smith who had made the complaint. Pinkney did say to Smith "if you don't think I know what the fuck is going on with lieutenants backing sergeants, you must think I'm crazy."  Smith then called plaintiff after this meeting and discovered that plaintiff had complained to Budish.  Smith was transferred from the Detective Bureau to the Night Shift Perimeter on March 27, 2016.  Smith suspects that his support for plaintiff lead to this transfer.[4]

According to Pinkney, Budish spoke to him regarding plaintiff at some point.  Budish told him that plaintiff had sent him emails complaining about Pinkney.

On March 4, 2016, HR issued a letter to Pinkney, informing him that a discrimination complaint had been filed against him and that there would be an investigation.  It did not identify plaintiff as the complainant.  However, Pinkney testified that he figured out that it was plaintiff when Acosta interviewed him soon thereafter.

Acosta had completed her investigation into plaintiff's complaint regarding Pinkney in April 2016.  She conducted interviews with plaintiff, Captain Peters, Smith, and Pinkney. Pinkney indicated during his interview that he was aware that plaintiff had previously filed a charge of discrimination against the Department.

---

[4]     Plaintiff asserts at multiple points in his brief that Smith was told he was going to be transferred out of the Detective Bureau during this January 19, 2016 meeting. There is no support in the record for this allegation.

5

On May 11, 2016, HR informed plaintiff that it had conducted a full investigation into his allegations against Pinkney.  The investigative report concluded that there was "insufficient evidence to substantiate that Sheriff Pinkney engaged in conduct that" violated Cuyahoga County policies and procedures.

On June 18, 2016, plaintiff filed another EEOC charge.  He alleged that the Department had discriminated and retaliated against him.  Specifically, he alleged that he had been subject to disparate treatment and a lack of access to overtime hours since his 2014 EEOC charge.  He referenced his January 2016 email to Budish and asserted that the resulting HR investigation was insufficient.

*Removal from UDF Team*

The UDF team was created in late 2014–early 2015 to investigate instances of police officers using deadly force.  This team worked in conjunction with the City of Cleveland and was involved in high profile investigations such as the Tamir Rice shooting.  The UDF team came under some media scrutiny over some training trip expenses soon after its inception.

According to Pinkney, he decided to review the staffing of the UDF team because it was a new unit.  Pinkney testified that he, Smith, and Peters carefully went through the entire team to determine who was needed.  After this evaluation, Pinkney decided to remove those members who were "expendable" and reduce the size of the UDF team.

On February 12, 2016, Pinkney issued a memo to all law enforcement staff listing the 10 individuals who would comprise the UDF team effective March 1, 2016.  Detectives Melissa Harris ("Harris") and John Morgan ("Morgan") remained on the UDF team.  Smith, plaintiff, and Lieutenant Sharpe ("Sharpe"), among several others, were removed.  The overall size of the

UDF team had been significantly reduced.

According to Captain Donald Gerome ("Gerome"), he supervised plaintiff when he was on the UDF team.  Gerome does not know why plaintiff was moved off the team.  He did not play a role in this decision and was handed a list of who would remain on the team.

According to Smith, plaintiff's performance on the UDF team was "excellent."  Smith was not involved in the process of selecting who would remain on the team.  Smith did tell Pinkney that some of the best detectives had been removed from the team.

According to plaintiff, both Harris and Morgan were "problematic" during their time on the UDF team.  Harris would use her relationship with Pinkney as "leverage" and would often "go outside the chain of command."  Morgan also refused to follow the chain of command, which plaintiff and the other supervisors found frustrating.  Plaintiff felt that he was replaced by individuals who had less training than he did.

During his tenure on the UDF team, plaintiff was assigned a take-home vehicle.  After plaintiff was removed from the UDF team, Pinkney learned that plaintiff and Sharpe still had take-home vehicles.  Pinkney asked Peters why these two sergeants needed vehicles because he had staff "responding to heroin overdoses that don't have a take-home car."  Peters told Pinkney that neither of these sergeants needed a take-home vehicle because they were not responding to anything.  Plaintiff and Sharpe's take-home vehicles were subsequently taken away.

*Removal from Detective Bureau*

In the Detective Bureau, plaintiff's rank was sergeant and he supervised 6-8 deputy detectives.  Several deputies discovered that plaintiff had two criminal convictions as a young adult.  These convictions had been pardoned through the Governor's office.

7

According to plaintiff, these deputies attempted to use his criminal history and mug shot to undermine his authority.  Plaintiff reported this to Peters and the Prosecutor's office. According to plaintiff, Smith told him that on January 14, 2016, deputies Slattery and Lever spoke with Pinkney regarding plaintiff's mug shot.  According to Pinkney, he does not recall meeting with these deputies to discuss this issue.  Pinkney testified that at some point he did become "aware of someone circulating [plaintiff's] photos around," but does not recall the year. Pinkney was concerned because he wanted to ensure that plaintiff was "legit," i.e., properly hired.  He had some of his staff "look into what it was all about" and when it came back from the Attorney General's office that he was "okay to be on the Sheriff's Department" that was "good enough for" him.

On January 29, 2016, Smith gave plaintiff a positive annual evaluation.  According to Smith, Pinkney initially did not "sign off" on plaintiff's evaluation because the scores seemed "too high."  Pinkney told him he needed to provide a justification for these scores.  Smith refused to change the evaluation.  Pinkney did not request this justification on another sergeant's evaluation.  According to Pinkney, if an evaluation had very high or very low marks, it was county policy to provide a justification for these scores.  Pinkney reminded Smith of this and told him to bring the evaluation back to him with justification.  The scores on plaintiff's evaluation were never changed and remained high.

According to Smith, plaintiff was an "excellent detective" but there were a "few issues" with his management style in the Detective Bureau.  Two of the deputy detectives in the unit, Morgan and Harris, repeatedly complained about plaintiff's treatment of them.  According to Pinkney, "a lot of people," including Harris and Morgan, complained about plaintiff's

8

managerial style.  Pinkney testified that the "gist" of the complaints were that plaintiff was aggressive and disrespectful.

On January 27, 2016, plaintiff completed Harris's performance evaluation and gave her low scores in all categories.  He noted that "Deputy Harris should concentrate on completing tasks as assigned and following the chain of command.  She is capable of being a good detective and through training and experience will gain the skill set necessary to bring about positive change."

Peters called Smith into his office regarding this evaluation.  Peters requested that Smith re-evaluate Harris because the scores plaintiff gave her were too low.  Smith told Peters that he could either order him to do so or allow plaintiff's evaluation to stand.  According to Smith, he believes that Peters ended up re-evaluating Harris himself.  He does not know if Pinkney was involved in this situation, but he was aware that Harris and Pinkney had a relationship outside of work.

Smith also testified that Pinkney told him in February 2016 that he planned to "move people around" the Department.  Smith does not recall Pinkney specifically mentioning plaintiff. According to plaintiff, he was told twice in early 2016 that he was going to be removed from the Detective Bureau.  Smith told him "potentially" close to January 2016, but plaintiff does "not know the exact date."  Peters told him around March 2016.

On May 10, 2016, the Department announced that the next promotional exam for Deputy Sheriff Lieutenants would take place on June 26, 2016.  Deputy Sheriff Sergeants with three years of experience were eligible.  Plaintiff was three months short of being eligible for this exam.  Plaintiff sent a request to HR that he be allowed to sit for the exam.  He did not receive a

9

reply to this request.

On November 7, 2016, the Deputy Sheriff's Union submitted a form to HR regarding plaintiff.  This form alleged that plaintiff had created a hostile work environment for two deputies subordinate to him.  On March 30, 2017, Harris filed an internal complaint against plaintiff, alleging that he had discriminated and retaliated against her.

In early 2017, Chief Deputy George Taylor ("Taylor") was charged with the role of improving the Department.  Taylor testified that he decided to transfer the sergeants and lieutenants around the Department to improve the level of supervisor experience.  When Taylor was in the process of determining which transfers to make, he consulted with Pinkney, Peters, and Gerome.  Pinkney did not express any specific opinion about where plaintiff was to be transferred.  Taylor ended up transferring 14 out of the 16 sergeants in the Department.  The two sergeants that were not transferred had specific skills and knowledge which required them to stay in their current positions.

On March 9, 2017, Taylor issued a letter to plaintiff, informing him that he was to be transferred to the Juvenile Justice Center ("JJC"), effective April 2, 2017.  According to Taylor, he transferred plaintiff because he, like the other sergeants in the Department, needed to be exposed to different areas.  Taylor also made this transfer determination because of the "tensions" between plaintiff and Harris.  Taylor was aware that plaintiff had filed a complaint against the Department.  Pinkney also had told Taylor that he was upset that plaintiff had filed the complaint and that he did not agree with the accusations.

Plaintiff's rank and rate of pay remained the same with this transfer.  However, plaintiff was displeased with this transfer decision.  On March 24, 2017, plaintiff sent a memo to

10

Lieutenant Nestor Rivera.  He requested reconsideration and reasonable explanation for his transfer to the JJC.  According to plaintiff, he knew this transfer was in "retaliation" for his complaints because the JJC was "historically a punishment post for sergeants within the department."

Taylor testified that he was not aware that the JJC was viewed as a "punishment post." According to Smith, the old JJC was a "punishment post" because it was "disgusting" and an "old dungeon of a building."  However, at the time of plaintiff's transfer, the JJC was a new, $200 million facility.  Smith was in charge of its opening, which he viewed as an "honor." Pinkney also did not view the JJC as a punishment post.

Gerome, plaintiff's supervisor at the time of the transfer, testified that plaintiff was transferred because Taylor wanted to rotate sergeants and give them a more varied experience. Gerome did not have any discussions with Taylor over the transfers.  Gerome testified that before the new JJC facility opened, there was a "rumor" that it was a "punishment post." According to Gerome, it is now a "sought after position in the department."

Plaintiff was still assigned to the HVEO and Marine Patrol team after this transfer. However, according to plaintiff, his transfer made it more difficult for him to take advantage of these overtime opportunities.  Plaintiff testified that during his time in the Detective Bureau, he was on a "flex schedule" and could better arrange his hours to work overtime.  Plaintiff did not have this option at the JJC because he worked a set shift and kept court hours.  The JJC also had less internal overtime opportunities than the Detective Bureau.  The JJC was also in a different location from where the HVEO vehicles were kept.  HVEO records indicate plaintiff earned $6,896.36 in overtime from October 2016 through September 2017.

11

After his transfer, plaintiff testified that he was "made aware" that a deputy was passing around his mugshot at the JJC.  In response, Pinkney instructed the Department's Captains and Lieutenants to remind their staff at roll call that no one is to disseminate information without having prior approval.

On December 18, 2017, the Department announced a limited number of openings to the K-9 unit.  Applicants were required to have one year of experience as a deputy sheriff.  Plaintiff applied but was not selected.  He also applied for a training officer position but was not selected. He thinks that he applied for a narcotics position as well.

After his transfer to the JJC, plaintiff submitted 58 requests for training which were either denied or ignored.  Plaintiff testified that his supervisor at the time, Lieutenant Rivera, had wanted to approve some of the training requests but was told to deny them.  Plaintiff is not certain if these trainings were related to his role at the JJC.  The Department's training records indicate that from 2010 – 2019, plaintiff attended 134 training courses.  The records indicated plaintiff attended 9 classes in 2010, 7 classes in 2011, 15 classes in 2012, 5 classes in 2013, 15 classes in 2014, 20 classes in 2015, 19 classes in 2016, 27 classes in 2017, 12 classes in 2018, and 5 classes in 2019.

*2017 Internal Complaint*

At some point in 2017, plaintiff filed another internal complaint with HR and requested that the investigation into his prior complaint be re-opened.  His complaint centered around the dissemination of his mug shot and the need for a "reasonable explanation" for his transfer to the JJC.  Plaintiff subsequently met with HR regarding his complaint on October 17, 2017.

On January 4, 2018, plaintiff emailed HR to follow up on the October 17, 2017 meeting.

12

An HR representative responded that same day via email.  Within the email, the HR representative explained that during the October 2017 meeting, plaintiff had indicated he would not answer certain questions unless his attorney was present.  The HR representative further explained that he had been waiting for plaintiff to provide him with dates where he and his attorney would be available so that he could "schedule that round of questioning."

On January 12, 2018, HR issued a letter to plaintiff, informing him that it had completed a review of his allegations.  With respect to his allegation regarding the dissemination of his sealed record, HR concluded that because plaintiff would not name the source of the information "there is no way to determine the origin of the information you claim was distributed via text message."  With respect to his request for a "reasonable explanation" for his new assignment at the JJC, HR informed plaintiff that after speaking with Pinkney and Sheriff Management Staff, this current assignment was "based strictly on department structure and operational needs."  However, HR informed plaintiff that his request to reopen his prior hostile work environment complaint was still under consideration.

On January 26, 2018, HR issued plaintiff a letter regarding his request to re-open his hostile work environment claim.  HR concluded that plaintiff had "presented no new facts or evidence that warrants re-opening the matter."  HR noted that plaintiff was provided with an opportunity to meet with HR in October 2017 and "did not provide any information during that meeting that supports re-opening the case."  Accordingly, HR closed the matter.

In August 2018, plaintiff applied for a position as a police officer with the City of Avon, Ohio.  He was subsequently hired and began this new position on July 1, 2019.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

Plaintiff opposes the Motion.[5]

## **STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*

---

[5]     Plaintiff has indicated that he will no longer "pursue his claims of race-based discrimination or hostile work environment" under § 1981 and O.R.C. §4112.02(A).  Accordingly, Court Three in its entirety and the discrimination claims contained within Count One are DISMISSED from this action.

14

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## ANALYSIS

**I.      Federal Claim (Count One)**

Count One asserts a claim for retaliation under 42 U.S.C. § 1981.  Defendant argues that it is entitled to summary judgment in its favor because plaintiff is unable to establish a *prima facie* case of retaliation.  According to plaintiff, summary judgment is inappropriate because he has established a *prima facie* case of retaliation.

"The elements of a retaliation claim under § 1981 are the same as those under Title VII." *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019).  To establish a *prima facie* case of retaliation, plaintiff must show that 1) he engaged in protected activity; 2) the employer was aware of plaintiff's protected activity; 3) the employer subsequently took a materially adverse action against plaintiff; and 4) a causal connection existed between the protected activity and the materially adverse action.  *Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014).

If the plaintiff is able to establish a *prima facie* case of retaliation, the burden shifts to the

15

defendant to "articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the defendant carries that burden, the burden then shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision," but merely a pretext.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Upon review, the Court finds that plaintiff engaged in a protected activity.  It is undisputed that plaintiff filed an EEOC charge in 2014, an internal HR complaint in 2016, an EEOC charge in 2016, and an internal HR complaint in 2017.[6]  Each of these complaints were lodged in opposition to allegedly discriminatory and retaliatory practices and, therefore, constitute protected activities.  *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 Fed. Appx. 651, 655 (6th Cir. 2012) ("[C]omplaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a *prima facie* case of retaliation.")

The Court also finds that there is sufficient evidence from which a reasonable juror could conclude that defendant was aware of plaintiff's protected activity.  It is undisputed that Pinkney was aware of plaintiff's 2014 EEOC charge.  It is also undisputed that Pinkney was aware of plaintiff's January 2016 HR complaint by April 2016.  Moreover, viewing the evidence in a light most favorable to plaintiff, the Court also finds that Pinkney was aware of plaintiff's January

---

[6]    In its reply brief, defendant argues for the first time that plaintiff did not engage in a protected activity because plaintiff "does not explain" how his 2016 internal HR complaint was a "good faith discrimination or retaliation claim."  This argument is improperly raised in a reply brief and the Court declines to consider it.  *See Scottsdale Ins. Co v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are deemed waived).

2016 complaint prior to plaintiff's February 2016 removal from the UDF team.  On January 14, 2016, plaintiff emailed Budish to report that Pinkney had retaliated against him for his 2014 EEOC complaint.[7]  He then filed a formal complaint with HR on January 19, 2016.  According to Smith's testimony, on January 19, 2016, Pinkney told him that Budish had admonished him about a complaint he had recently received.[8]  Pinkney also testified that Budish had told him at some point that plaintiff sent him emails complaining about Pinkney.  *See Hicks v. SSP Am., Inc.*, 490 Fed.Appx. 781, 785 (6th Cir. 2012) ("Knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action.")  Based on this evidence, a reasonable juror could conclude that defendant was aware of plaintiff's protected activities at the time plaintiff was removed from the UDF team in February 2016.

With respect to the third element, plaintiff argues that his removal from the UDF team and his transfer from the Detective Bureau to the JJC constituted materially adverse actions.  According to defendant, plaintiff's removal from the UDF team and the transfer to the JJC cannot constitute adverse actions because he retained the same title, duties, pay, benefits, and overtime opportunities.

---

[7]    Defendant makes much of the January 19, 2016 memorandum that plaintiff purportedly sent to Budish.  As noted *supra*, this memorandum references things that occurred after January 19, 2016, calling into question its veracity.  However, regardless of whether plaintiff sent this particular memorandum to Budish, documentary evidence establishes that plaintiff did in fact email Budish with his complaints on January 14, 2016.  (Exhibit P)

[8]    While defendant makes several arguments as to why Smith's testimony is not credible, it is not this Court's function to weigh Smith's credibility at the summary judgment stage.

17

As discussed above, plaintiff must show that defendant took an action "materially adverse" to him.  An action is "materially adverse" when it "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Funk v. City of Lansing, MI*, 821 Fed.Appx. 574, 583 (6th Cir. 2020) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  This includes actions that "are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," and "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington,* 548 U.S. at 68.  However, a "plaintiff's burden of establishing a material adverse employment action is less onerous in the retaliation context than in the anti-discrimination context."  *Michael v. Caterpillar Financial Services Corp.,* 496 F.3d 584, 595-596 (6th Cir. 2007).  The Sixth Circuit has characterized plaintiff's burden at this step as a "relatively low bar."  *Id.  See also Lyons v. Michigan Dept. of Corrections*, 812 Fed.Appx 305, 309 (6th Cir. 2020).

Given this "relatively low bar," the Court finds that a reasonable juror could conclude that defendant took an action which was materially adverse to plaintiff.  Here, plaintiff has provided evidence that after filing his January 2016 HR complaint, he was moved off a prestigious job assignment with the UDF team, his take-home vehicle was removed, and he was transferred to what he perceived as a less desirable job post within the JJC.  During his time in the Detective's Bureau, plaintiff had a flexible schedule.  Conversely, plaintiff worked a set shift during court hours at the JJC.  This more rigid schedule made it more difficult for him to participate in overtime.  Under these circumstances, a reasonable juror could find that these actions would dissuade a reasonable worker from making or supporting a charge of

18

discrimination.

Citing to *Argawal v. Montemango*, 574 Fed.Appx. 570, 576 (6th Cir. 2014), defendant argues that "it is well settled that a transfer is not a materially adverse employment action unless it is accompanied by a loss such as demotion or salary reduction." This argument is not well-taken. *Argawal* discusses what constitutes a "materially adverse employment action" in a discrimination claim. 574 Fed.Appx at 576-577. Because this is a retaliation claim, plaintiff does not need to show a "materially adverse employment action." Rather, plaintiff is charged with showing that defendant took an action "materially adverse" to him. *See Burlington*, 548 U.S. at 67–68 (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"). This distinction matters. Indeed, this "less onerous" burden "permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael,* 496 F.3d at 595-596.

The Court notes that plaintiff also attempts to use the theory of constructive discharge to establish a materially adverse action. Plaintiff argues that the following actions, in combination with his transfer, gave him "no choice" but to resign: (1) "failure to correct" the circulation of his mug shot; (2) Pinkney wanting a justification for plaintiff's high evaluation scores; (3) not being selected for open sergeant positions; (4) training requests being ignored or denied; and (5) the treatment of Smith after he supported plaintiff. According to defendant, plaintiff's "claim for constructive discharge fails as a matter of law."

"A constructive discharge is an adverse employment action for purposes of Title VII." *Funk*, 821 Fed.Appx at 581. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the

employee is forced into an involuntary resignation." *Laster*, 746 F.3d at 727.  Plaintiff must

show that (1) "the employer deliberately created intolerable working conditions, as perceived by

a reasonable person," and (2) "the employer did so with the intention of forcing the employee to

quit." *Id*. at 727–28

      For the following reasons, the Court finds that plaintiff has failed to demonstrate that a

reasonable juror could find that he was constructively discharged.  As an initial matter, plaintiff

has adduced no evidence showing that defendant took any of these actions with the intent to

force plaintiff to quit.

      With respect to the mug shot, it is undisputed that after Pinkney was made aware the mug

shot was again being circulated, he instructed his lieutenants to tell their staff they were not

permitted to disseminate information without prior approval.  Plaintiff filed an HR complaint

regarding the circulation of his mugshot in 2017.  However, he would not reveal who told him

that it was being circulated, so HR was unable to verify which staff member continued to

circulate his mug shot.  It is unclear what else plaintiff expected defendant to do in response to

this situation.

      With respect to plaintiff's annual evaluation, it is undisputed that plaintiff's performance

evaluation score was not changed.  There is no evidence that Pinkney requesting Smith "provide

justification" for the existing scores pursuant to HR policy negatively impacted plaintiff

professionally.  Plaintiff's evaluation score remained high.

      With respect to the open sergeant positions, plaintiff testified that he applied for a K-9

position, a training officer position, and he "believed" that he may have applied for a narcotics

position.  However, documentary evidence establishes that the K-9 position he applied for was

not open to sergeants, only deputies.  Plaintiff himself concedes that he is not certain that he actually applied for a narcotics position.  This leaves the training officer position.  Plaintiff has provided no evidence that he was actually qualified for this position or that the individual selected was somehow less qualified than he was.  Moreover, a reasonable person would not find a working environment to be "intolerable" because they were not selected for one position.

Plaintiff also argues that around 58 requests for training were denied or ignored after his transfer to the JJC.  He does not recall what these trainings were for and he is not certain if they were relevant to his role at the JJC.  Moreover, plaintiff's training records indicate that the amount of training plaintiff received in 2016 and 2017 was actually higher than the years previous.  Plaintiff does not dispute these training records.

As for the treatment of Smith, the Court is unclear how the treatment of another individual could create an intolerable work environment for plaintiff.  While third-party retaliation is a valid claim, it must be asserted by the third party.  *See Threat v. City of Cleveland*, 2021 WL 3140525, *5-6 (6th Cir. 2021).  Smith is not a party to this action. Accordingly, even viewing the evidence in a light most favorable to plaintiff, a reasonable juror could not find that plaintiff was constructively discharged.

Regardless, because a reasonable juror could find that the removal from the UDF team and the transfer to the JJC were materially adverse actions, the Court finds that plaintiff has satisfied this prong of his *prima facie* case.

Plaintiff must next present evidence showing that a causal connection exists between his protected activities and the materially adverse action.  To establish a causal connection, a plaintiff must show "that his or her protected activity was a but-for cause of the alleged adverse

21

action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Plaintiff argues that the temporal proximity between his January 2016 HR complaint and his February 2016 removal from the UDF team supports an inference of causation. The Court acknowledges that "in rare cases" temporal proximity alone may be enough to show a causal connection. *Alexander v. University of Memphis*, 2021 WL 2579973, *6 (6th Cir. 2021) (citing *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). Here, plaintiff emailed Budish regarding his retaliation allegations on January 14, 2016. He also filed an internal HR complaint on January 19, 2016. Smith testified that Pinkney told him on January 19, 2016 that a complaint had been lodged against him. Pinkney then removed plaintiff from the UDF team on February 12, 2016, less than a month later. The Sixth Circuit has found causation based on temporal proximity alone when such a short time period is involved. *Wyatt v. Nissan North America, Inc*., 999 F.3d 400, 421 (6th Cir. 2021) (finding where the alleged adverse employment action occurred within weeks of the protected activity, sufficient temporal proximity exists to establish a causal connection); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases holding that a two- to three-month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's *prima facie* case of retaliation).

Defendant argues that plaintiff cannot establish temporal proximity because "there is a significant lapse in time between the complaints and the transfer." However, defendant's arguments focus on the period of time between the protected activity and the transfer to the JJC. Defendant does not address the extremely short period of time between the January 2016 internal complaint and the February 2016 removal from the UDF team. Viewing the evidence in the light

22

most favorable to plaintiff, Pinkney was aware of plaintiff's January 2016 HR complaint when he made the decision to remove plaintiff from the UDF team weeks later.  Accordingly, plaintiff has produced enough evidence from which a reasonable juror could infer that defendant would not have removed him from the UDF team but for his protected activity.[9]

Although plaintiff has established a *prima facie* case of retaliation, his claim fails. Defendant has articulated several legitimate, non discriminatory reasons for plaintiff's removal from the UDF team and transfer to the JJC.  With respect to the UDF team, defendant has argued that the size of the UDF team needed to be reduced and plaintiff was simply among several individuals who were transferred off the team for this purpose.  This proffered explanation finds strong support in the record.  Indeed, defendant has presented evidence that the Department was being scrutinized publicly for the costs associated with the UDF team.  Pinkney then carefully reviewed the staffing of the UDF team and determined that the size of the unit needed to be reduced.  In February 2016, Pinkney issued a memorandum listing the 10 individuals who would comprise the UDF team, which nearly cut the size of the team in half.  It is undisputed that plaintiff was not the only one removed from this unit, but was among several individuals who were taken off the team.[10]

---

[9]     Plaintiff also provides arguments as to why there is a causal connection between his protected activity and his transfer to the JJC, including a laundry list of "retaliatory actions" plaintiff asserts defendant took against him.  The Court need not address these arguments because it is finding that sufficient evidence exists to infer a causal connection between the January 2016 HR complaint and the removal from the UDF team.

[10]     Moreover, defendant provides a legitimate reason for the removal of plaintiff's take-home vehicle.  It is undisputed that once plaintiff was taken off the UDF team, his take-home vehicle was also taken away.  Defendant has maintained that since plaintiff no longer had to respond to UDF calls, he no longer needed a take-

With respect to the JJC transfer, defendant argues that plaintiff was transferred from the Detective Bureau to the JJC because a decision had been made to transfer most of the sergeants in order to provide increased experience and cross training.  This proffered explanation also finds strong support in the record.  In February 2016, Pinkney had told Smith that he planned to "move people around."  In 2017, Taylor made the decision to transfer the sergeants and lieutenants around the Department in order to cross train them and improve their level of experience.  Taylor ended up transferring 14 out of the 16 sergeants in the Department.  The only two that were not transferred had either special skills or certifications that required them to remain in their current assignment.  Gerome's testimony also confirms that these transfers were done to give the sergeants a more varied experience.  The 2017 HR investigation into this transfer also found that plaintiff's new assignment was "based strictly on department structure and operational needs."

Because defendant has provided a legitimate, non discriminatory reason for its actions, the burden then shifts to plaintiff to show a genuine dispute of material fact as to whether these reasons are pretextual.  A plaintiff can establish pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (internal quotations omitted).

---

home vehicle.  The record also supports this explanation.  Defendant has provided evidence that both plaintiff and another sergeant had their take-home vehicles removed after leaving the UDF team.  Pinkney provided testimony that the Department simply does not have enough vehicles to provide to every sergeant and, therefore, reserves the vehicles for those staff members that need to respond to emergency calls during the night.  Plaintiff has offered no evidence to dispute this explanation.

24

Upon review, the Court finds that plaintiff fails to present any evidence that creates a genuine dispute of material fact that defendant's proffered reasons were pretextual.  Plaintiff suggests that the timing of his protected activity and the adverse job actions establish pretext.  However, while  temporal proximity is enough "to satisfy the causation prong of [his] *prima facie* retaliation case, temporal proximity alone cannot prove pretext."  *Alexander,* 2021 WL 2579973 at *6.  Plaintiff also notes that both Pinkey and Taylor were aware of his protected activity at the time the decision was made to transfer him to the JJC.  However, this is simply a reiteration of the arguments plaintiff made to establish the second prong of his *prima facie* case.

In short, plaintiff has offered no evidence which would allow a reasonable juror to find that defendant's explanations are pretextual.  He does not dispute that the UDF team was cut in half due to a decision to reduce the size of the unit.  While the parties disagree as to whether or not the JJC is a "punishment post," plaintiff has adduced no evidence that his transfer, like the transfer of 13 of his counterparts, was not made for cross training purposes*.  See Gribcheck v. Runyon*, 245 F.3d 547, 552 (6th Cir. 2001) (observing that a "blanket denial" of an employer's articulated reasons for the adverse action is "not enough" and that "a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive") (quoting *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987)).  Accordingly, plaintiff has not created a genuine factual dispute that defendant's proffered reasons have "no basis in fact" or were insufficient to warrant defendant's choice to remove him from the UDF team and transfer him to the JJC.

Accordingly, the Court grants summary judgment to defendant on Count One.

**II.**      **State Law Claim (Count Two)**

In Count Two, plaintiff asserts a state law claim for retaliation in violation of O.R.C. §4112.02(I).  "[R]etaliation claims under Ohio law are analyzed the same way as under federal law."  *Allman v. Walmart, Inc.*, 967 F.3d 566, 571 (6th Cir. 2020).  Therefore, for the reasons explained above, the Court finds that plaintiff's state law retaliation claim cannot survive summary judgment.

Accordingly, the Court grants summary judgment to defendant on Count Two.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

           /s/ Patricia A. Gaughan
           PATRICIA A. GAUGHAN
           United States District Judge
Dated:  8/23/21         Chief Judge

26